T.C. Memo. 2018-29

UNITED STATES TAX COURT

STEFAN A. TOLIN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17318-08.                    Filed March 19, 2018.

<u>Richard Warren Craigo</u>, for petitioner.

<u>Ardney J. Boland, III</u> and <u>Emile L. Hebert, III</u>, for respondent.

MEMORANDUM OPINION

GALE, <u>Judge</u>:  This case is before the Court on petitioner's first amended
motion for reasonable litigation or administrative costs (motion for litigation
costs) in which petitioner seeks an award of litigation costs under section

[*2] 7430[1] and Rule 231 of $260,982 claimed with respect to the litigation of his deficiency case, decided in Tolin v. Commissioner, T.C. Memo. 2014-65. We decide petitioner's motion on the basis of the parties' submissions and the existing record.[2] The portions of our opinion in Tolin v. Commissioner, T.C. Memo. 2014-65, that are relevant to our disposition of the motion are incorporated herein by this reference.

## Background

During 2002, 2003, and 2004, the years at issue in the deficiency case, petitioner resided in Minnesota and conducted a general solo law practice in Minneapolis. He also conducted a thoroughbred horse breeding and racing activity (thoroughbred activity). That activity involved petitioner's effort to profit from breeding a stallion he owned, named Choosing Choice, to horses located primarily in Louisiana, including awards for the racing success of Choosing Choice's offspring. A substantial portion of petitioner's participation in the thoroughbred activity during the years at issue was effected through long-distance

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as amended, and Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded to the nearest dollar.

[2]Neither party requested a hearing with respect to the motion. See Rules 231(b)(8), 232(b).

[*3] telephone calls with the proprietor of the farm and breeding facility in Louisiana where Choosing Choice was boarded, a knowledgeable Louisiana thoroughbred breeder and bloodstock agent who had agreed to advise petitioner concerning the Louisiana industry, and an officer of the Louisiana Thoroughbred Breeders Association, as well as numerous potential customers for Choosing Choice's stud services in Louisiana.

Respondent examined petitioner's Federal income tax returns for 2002, 2003, and 2004 and raised questions concerning whether the losses reported each year on the Schedules C, Profit or Loss From Business, for the thoroughbred activity were "passive activity" losses. See sec. 469. During the examination, petitioner provided substantiation of his participation in the thoroughbred activity, including a 15-page narrative summary that he prepared covering 2002 (but not 2003 or 2004),[3] the promotional materials for Choosing Choice that petitioner prepared and sent to breeders, and five months of phone bills for petitioner's cell phone (falling within the three years under scrutiny). Petitioner also provided affidavits from the breeding facility proprietor and the bloodstock agent

---

[3]The examining agent's notations on this narrative summary indicate that the agent discounted the bulk of petitioner's activities as those of an investor. See sec. 1.469-5T(f)(2)(ii), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).

[*4] previously mentioned, in which each described the near daily phone calls he had with petitioner concerning the thoroughbred activity during 2002, 2003, and 2004. Various items on the Schedules C for petitioner's law practice were also questioned.

On April 13, 2008, respondent issued a notice of deficiency for petitioner's 2002, 2003, and 2004 taxable years determining that the Schedule C loss deductions claimed each year with respect to the thoroughbred activity were disallowed as attributable to passive activity losses. The notice also determined adjustments to several items on the Schedules C for petitioner's law practice for the foregoing years (unagreed law practice adjustments), and certain adjustments to gross receipts for each year and to rent expense for 2002 to which petitioner had agreed during the examination (agreed law practice adjustments).

On or about April 20, 2008, petitioner retained an attorney to represent him in connection with the deficiency determinations for 2002, 2003, and 2004.

Petitioner timely petitioned for redetermination, disputing respondent's determinations concerning the unagreed law practice adjustments and the passive activity losses.[4] In his answer, filed September 15, 2008, respondent took the

---

[4]The petition also averred that the agreed adjustments were subject to certain offsets.

[*5] position that petitioner had not shown that he materially participated in the thoroughbred activity during the years at issue and that consequently section 469 precluded him from deducting the losses from the activity.

The case was initially set for trial in Los Angeles, California (the place of trial designated by petitioner), on June 22, 2009.

On April 30, 2009, petitioner's counsel mailed to respondent's counsel a letter that was designated a "qualified offer" for purposes of section 7430 (qualified offer letter) and was timely for that purpose. The qualified offer letter states in pertinent part:

> Please note that the petitioner and respondent have previously agreed in writing to a deficiency in taxes of $10,933.00 and penalties of $2,088.15[5] relative to * * * [petitioner's 2002, 2003, and 2004 taxable years]. That amount, having already been agreed, [sic] to does not make up any portion of this Qualified Offer. The Qualified Offer which we are authorized to make on behalf of our client is to concede the following additional amounts of income taxes (plus statutory interest):
>
> | Year | Taxes |
> | --- | --- |
> | 2002 | $500.00 |
> | 2003 | $500.00 |
> | 2004 | $500.00 |

[5]The $10,933 and $2,088.15 figures correspond to the aggregate income tax liability and the penalties attributable to the agreed law practice adjustments for 2002, 2003, and 2004.

**[*6]** Respondent took no action with respect to the qualified offer letter within 90 days after it was sent.

Petitioner's counsel's timesheet entries for May 19 and 20, June 3, and July 8, 2009, all refer to telephone conferences, review, research, or settlement of "side issues"--a term petitioner's counsel used in his submissions in support of the motion for litigation costs to describe the unagreed law practice adjustments.

Also on April 30, 2009, petitioner's counsel sent an additional letter to respondent's counsel enclosing a lengthier and more detailed affidavit of the breeding facility proprietor, outlining the number of employees of the facility and their hours devoted to the care of horses there, including petitioner's. The affidavit also described in greater detail petitioner's promotional activities for Choosing Choice as observed by the proprietor (which he characterized as extensive in relation to other breeders' promotional efforts) and the virtually daily phone calls that the proprietor received from petitioner concerning the care of, and breeding program for, Choosing Choice, as well as other horses petitioner boarded with the proprietor.

On May 19, 2009, petitioner's counsel provided respondent's counsel with a revised narrative summary covering petitioner's participation in the thoroughbred activity for 2002 and, for the first time, 2003 and 2004.

**[*7]**   On June 3, 2009, petitioner moved for a change in place of trial to New Orleans, Louisiana, on the grounds that all witnesses other than petitioner resided there.  The Court granted the change in place of trial and continued the case.  The case was thereafter set for trial in New Orleans on November 16, 2009.

On July 24, 2009, respondent's counsel sent petitioner's counsel a letter requesting that he execute a document entitled "Partial Stipulation of Settled Issues".  The settled issues described in that document included the unagreed law practice adjustments.  On September 22, 2009, petitioner's counsel executed a "Stipulation of Agreed Issues" which settled the unagreed law practice adjustments and an additional issue, namely, whether a section 6651(a) addition to tax would apply to the unagreed law practice adjustments.  Respondent's counsel executed the "Stipulation of Agreed Issues" on October 7, 2009.

On October 1, 2009, respondent's counsel received from petitioner's counsel an additional 16 months of recently obtained phone bills for petitioner's cell phone, spanning 2003 and 2004, for a total of 21 months in those years.  At some point during the preceding 12 months, petitioner's counsel had provided 15 months of phone bills for petitioner's land line at his law office in Minneapolis, Minnesota.  In a cover letter accompanying the newly obtained cell phone bills, petitioner's counsel advised that these bills substantiated larger amounts of long-

**[*8]** distance telephone call time than petitioner had previously estimated for the narrative summary. In addition, petitioner's counsel advised that he had obtained estimates from the breeding facility proprietor and the bloodstock agent of the calls each had placed to petitioner during the years at issue.[6] Combined, their estimates totaled approximately 35 hours each year. Petitioner's counsel advised that the narrative summary being provided to respondent on that date had been revised to reflect increased phone call time as a result of the foregoing: an additional 35 hours per year for incoming calls, and an additional 112 hours, 144 hours, and 30 hours for 2002, 2003, and 2004, respectively, based on more complete phone bills.[7] Petitioner offered this revised narrative summary into evidence at trial.

In the narrative summary, petitioner described the work he had performed with respect to the thoroughbred activity for each year at issue and estimated the time he spent performing this work. He estimated that he spent 744 hours, 681 hours, and 860.5 hours working on the thoroughbred activity in 2002, 2003, and

---

[6]As incoming calls to petitioner, these calls would not have appeared on petitioner's phone bills.

[7]Petitioner's counsel devised a formula to extrapolate outgoing phone call volumes for 2002 (a year for which he was unable to obtain phone bills) on the basis of phone call volumes for 2003 and 2004--years for which 88% (21 of 24 months) of phone bills had been obtained.

[*9] 2004, respectively. Within these estimates, petitioner separately listed the timethat he spent on long-distance telephone calls with the breeding facility proprietor, the bloodstock agent, potential clients for stud services, and other persons outside Louisiana connected with the activity.

On November 10, 2009, respondent's counsel executed stipulations establishing (i) the authenticity of petitioner's telephone bills previously described; (ii) that the bloodstock agent offered advice to petitioner in almost daily phone calls during the years at issue (which the agent estimated involved 50-100 hours per year) and in several meetings in Louisiana, and that the bloodstock agent believed, on the basis of his own observation and the comments of other Louisiana breeders whom petitioner contacted, that petitioner's stallion promotion efforts were diligent; (iii) that the proprietor of a boarding facility where one of petitioner's horses was boarded and prepared for sale in 2003 received calls from petitioner three to four times a week; (iv) that the proprietor of a training facility petitioner used for some of his horses in 2003 and 2004 spoke with petitioner by telephone every 7 to 10 days and that petitioner visited the training facility more than most other owners with horses there; (v) that petitioner telephoned the proprietor of a boarding facility where one of petitioner's horses boarded for four to five months in 2004 "incessantly" with daily instructions on the care of that

[*10] horse; and (vi) that petitioner made trips to Louisiana of approximately three dayson five occasions in 2002, three occasions in 2003, and six occasions in 2004.

On November 17, 2009, one day before the scheduled trial,[8] the parties requested a continuance, citing petitioner's sudden, unexpected medical problems, which the Court granted.  In connection with the anticipated trial, petitioner's counsel filed a pretrial memorandum designating four witnesses:  petitioner, the breeding facility proprietor and the bloodstock agent whose affidavits had previously been provided to respondent's counsel, and the chief executive officer of the Louisiana Thoroughbred Breeders Association.

The case was thereafter set for trial on May 11, 2010.  However, one week before the trial, petitioner's counsel moved to bifurcate the trial, in view of the fact that a new medical problem petitioner had developed precluded his traveling to New Orleans.  Petitioner's counsel proposed that the May 11 trial nonetheless proceed in order to take the testimony of petitioner's two witnesses located there-- the breeding facility proprietor and the chief executive officer of the Louisiana Thoroughbred Breeders Association--with petitioner's testimony to be taken at a

---

[8]After having been scheduled for trial during the trial session commencing November 16, 2009, the case was given a specific trial date of November 18, 2009.

[*11] later trial setting when his condition permitted. The Court granted petitioner's counsel's motion.

Petitioner's counsel filed a pretrial memorandum in connection with the May 11 trial that contained revisions to the previous one, including: (1) the elimination of the bloodstock agent as a witness;[9] (2) a more precisely drawn statement of the facts; and (3) additional caselaw citations.

Petitioner's testimony was ultimately taken in a continuation of the trial on August 18, 2010, which included his testimony with respect to the narrative summary and his cross-examination thereon.

The parties thereafter filed simultaneous opening and reply briefs.

In our opinion in the deficiency case, we held that petitioner's losses from the thoroughbred activity for the years at issue were not disallowed under section 469(a) because petitioner had established that he materially participated in the activity each year by virtue of satisfying the requirement of section 1.469-5T(a)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988), that he participate in the activity "for more than 500 hours during * * * [the taxable]

_____

[9]It is apparent that this witness was eliminated because petitioner's counsel had obtained stipulations covering the substance of his testimony. The possibility that this would occur had been noted in petitioner's previous pretrial memorandum.

**[*12]** year". In reaching that conclusion for each year we accepted, with small discounts, petitioner's estimates of his time spent on long-distance telephone calls and trips to Louisiana. Those estimates constituted the bulk of the 500 hours of participation we found in each year: phone calls and trips of 300 hours and 150 to 180 hours, respectively, for 2002; phone calls and trips of 325 to 350 hours and 120 to 150 hours, respectively, for 2003; and phone calls and trips of 270 hours and 210 to 250 hours, respectively, for 2004. We found that the remainder was readily accounted for in each year by virtue of petitioner's work distributing promotion materials and various other administrative tasks.

After issuance of the opinion in the deficiency case, the parties filed a computation for entry of decision in which they stipulated that petitioner had deficiencies in tax attributable to the unagreed law practice adjustments, as well as certain other adjustments, that totaled $2,218, $1,796, and $2,024 for 2002, 2003, and 2004, respectively. Thereafter, petitioner filed the motion for litigation costs, and respondent filed a response opposing it. Petitioner made two additional submissions, and respondent made one, with respect to the motion.

**[*13]**                                    <u>Discussion</u>

<u>Applicable law</u>

Section 7430(a) authorizes the award of reasonable litigation costs to the prevailing party in court proceedings brought by or against the United States in connection with the determination of, inter alia, any income tax.  <u>See</u> <u>Corson v. Commissioner</u>, 123 T.C. 202, 205 (2004).  Section 7430(b) limits the award of such costs to prevailing parties that have exhausted administrative remedies and not unreasonably protracted the court proceeding.  <u>See</u> sec. 7430(b)(1), (3); <u>Corson v. Commissioner</u>, 123 T.C. at 205.  Section 7430(c)(4)(A) provides that a taxpayer qualifies as a prevailing party if (1) the taxpayer substantially prevailed with respect to the amount in controversy or the most significant issue or set of issues and (2) the taxpayer meets an applicable net worth requirement.  <u>See</u> <u>Corson v. Commissioner</u>, 123 T.C. at 206.  However, a taxpayer who meets the requirements of section 7430(c)(4)(A) will not be treated as a prevailing party if the Commissioner's position in the court proceeding was "substantially justified".  <u>See</u> sec. 7430(c)(4)(B)(i); <u>Corson v. Commissioner</u>, 123 T.C. at 206.  Although the taxpayer has the burden of proving that he satisfies section 7430(c)(4)(A), the Commissioner must show that the Commissioner's position was substantially

**[*14]** justified. See sec. 7430(c)(4)(B)(i); Rule 232(e); Corson v. Commissioner, 123 T.C. at 206.

In addition, a taxpayer meeting the applicable net worth requirement may be treated as the prevailing party--without regard to whether the Commissioner's position was substantially justified--under the "qualified offer" provision of section 7430(c)(4)(E). See Haas & Assocs. Accountancy Corp. v. Commissioner, 117 T.C. 48, 59 (2001), aff'd, 55 F. App'x 476 (9th Cir. 2003); Estate of Lippitz v. Commissioner, T.C. Memo. 2007-293, 2007 WL 2780496. A qualified offer is defined in section 7430(g)(1) as a written offer which: (1) is made by the taxpayer to the United States during the qualified offer period; (2) specifies the offered amount of the taxpayer's liability (determined without regard to interest); (3) is designated at the time it is made as a qualified offer for purposes of that section; and (4) remains open during the period beginning on the date it is made and ending on the earliest of the date the offer is rejected, the date the trial begins, or the 90th day after the date the offer is made. The taxpayer who has made such a qualified offer is treated as the prevailing party if the taxpayer's liability "pursuant to the judgment in the proceeding (determined without regard to interest) is equal to or less than the liability of the taxpayer which would have been so determined if

**[\*15]** the United States had accepted" the qualified offer.  Sec. 7430(c)(4)(E)(i);

see Swanson v. Commissioner, T.C. Memo. 2009-170, 2009 WL 2045254, at \*4.

Section 7430(c)(1) specifies the reasonable litigation costs that a prevailing

party can recover.  Such costs include reasonable court costs, see sec.

7430(c)(1)(A), and reasonable fees paid or incurred for the services of an attorney

in connection with the court proceeding, see sec. 7430(c)(1)(B)(iii).  Section

7430(c)(1)(B)(iii) provides that generally an award for attorney's fees shall not be

in excess of $125 per hour, adjusted annually for inflation,[10] "unless the court

determines that \* \* \* a special factor, such as the limited availability of qualified

attorneys for such proceeding, the difficulty of the issues presented in the case, or

the local availability of tax expertise, justifies a higher rate."  Petitioner bears the

burden of proving the amount of reasonable litigation costs.  See Rule 232(e);

Cozean v. Commissioner, 109 T.C. 227, 230 (1997).

Parties' positions

Petitioner seeks an award of all litigation costs paid or incurred from May 1,

2009 (the day after he contends he made a qualified offer), through January 31,

---

[10]The inflation-adjusted limitation on the hourly rate was $180 for 2009, 2010, and 2011.  See Rev. Proc. 2008-66, sec. 3.38, 2008-2 C.B. 1107, 1114; Rev. Proc. 2009-50, sec. 3.37, 2009-45 I.R.B. 617, 624; Rev. Proc. 2010-40, sec. 3.28, 2010-46 I.R.B. 663, 667.

[*16] 2011. He also contends that respondent's position was not substantially justified without regard to the qualified offer provisions and maintains that his reasonable litigation costs include the services of his counsel at an hourly rate of $400 because of his counsel's special expertise in the area of tax and equine law.

Respondent concedes that petitioner exhausted administrative remedies, did not unreasonably protract the court proceeding, and met the applicable net worth requirement. Respondent has also conceded that petitioner made a qualified offer (during the offer period[11]) on April 30, 2009, but contends that the amounts offered for each year were not equal to or greater than the amounts petitioner has stipulated are his liabilities pursuant to the decision that will be entered in this case. Finally, respondent concedes that petitioner substantially prevailed as to the most significant issue in this case, but contends that petitioner is not treated as a prevailing party under the statute because respondent's position in the proceeding was substantially justified.

Qualified offer

As explained infra pp. 31-32, we have concluded that respondent's position was substantially justified only through November 30, 2009, after which time

---

[11]The deficiency case was first set for trial at a trial session where the calendar call commenced on June 22, 2009. The qualified offer letter was dated April 30, 2009. See sec. 301.7430-7(c)(7), Proced. & Admin. Regs.

[*17] petitioner is the prevailing party for purposes of an award of costs. However, petitioner made a qualified offer within the meaning of section 7430(c)(4)(E) on April 30, 2009; that is, at a time when he would not otherwise be treated as a prevailing party under section 7430(c)(4)(A) and (B). We must therefore consider whether petitioner's qualified offer confers prevailing party status on him for any period before December 1, 2009. See sec. 7430(c)(4)(E)(iv); Estate of Lippitz v. Commissioner, 2007 WL 2780496, at *5 n.7. As explained below, we conclude that petitioner's qualified offer does not confer prevailing party status on him because it was not for an amount for each year equal to or greater than the amount petitioner has stipulated as his liability for the respective year pursuant to the decision that will be entered in this case.

The taxpayer's liability "pursuant to the judgment" encompasses increases in the taxpayer's liability resulting from both the Court's determinations regarding adjustments that the parties have litigated and from the pretrial settlement of adjustments included in the qualified offer. See sec. 301.7430-7(b)(3), (e), Example (2), Proced. & Admin. Regs. The adjustments included in the qualified offer are all those that are at issue when the offer is made. See id. para. (c)(3). Adjustments determined in a notice of deficiency that are settled before the qualified offer is made are not at issue when it is made. See id. para. (e),

[*18] Example (2).  The taxpayer's liability that "would have been so determined if * * * [the Commissioner] had accepted the last qualified offer" encompasses increases in the taxpayer's liability that would have resulted from the Commissioner's acceptance of the qualified offer.  See id. paras. (a), (b)(2).

The parties' dispute centers on whether the unagreed law practice adjustments were at issue when petitioner made the qualified offer, which would result in those adjustments' being treated as included in the adjustments that the qualified offer would have resolved.  See id. para. (c)(3).  Moreover, if the unagreed law practice adjustments are treated as included in the qualified offer, their settlement after the qualified offer was made means that they are included in the taxpayer's "liability pursuant to the judgment" under section 301.7430-7(b)(3), Proced. & Admin. Regs.  In that event, petitioner's "liability pursuant to the judgment" for 2002, 2003, and 2004 would be $2,218, $1,796, and $2,024, respectively--the amounts the parties stipulated as the deficiencies for each year resulting from their agreement covering the unagreed law practice adjustments. Petitioner's "liability pursuant to the judgment" would then not be equal to or less than the qualified offer he made--$500 for each year--with the result that petitioner would not be treated as the prevailing party pursuant to section 7430(c)(4)(E).

[*19] Petitioner argues that the qualified offer included only the passive activity loss adjustment and not the unagreed law practice adjustments. However, a review of the documentary evidence readily persuades us that the unagreed law practice adjustments were still at issue when petitioner made the qualified offer on April 30, 2009. The qualified offer itself was quite precise in stating that the agreed law practice adjustments had been agreed to and were therefore excluded from the offer.[12] Given this context, the qualified offer's silence with respect to the unagreed law practice adjustments creates a strong inference that those adjustments had not been settled at that time. Petitioner's counsel's timesheet entries (offered to substantiate his hours) show that the parties were still negotiating regarding the unagreed law practice adjustments after April 30, 2009. Entries for May 19 and 20, June 3, and July 8, 2009, all refer to telephone conferences, review, research, or settlement of "side issues". Petitioner's counsel

---

[12]As noted, the qualified offer letter states:

> Please note that the petitioner and respondent have previously agreed in writing to a deficiency in taxes of $10,933.00 and penalties of $2,088.15 relative to * * * [2002, 2003 and 2004]. That amount, having already been agreed, [sic] to does not make up any portion of this Qualified Offer. * * *

The foregoing figures match the aggregate deficiencies and penalties arising from the agreed law practice adjustments, as evidenced in a Form 4549-A, Income Tax Discrepancy Adjustments, respondent proffered.

[*20] used that term to describe the unagreed law practice adjustments in his submissions supporting the motion for litigation costs. That the adjustments were not settled before April 30, 2009, is confirmed by a letter respondent's counsel sent to petitioner's counsel on July 24, 2009, requesting that petitioner's counsel sign and return an enclosed "Partial Stipulation of Settled Issues". This stipulation covered the unagreed law practice adjustments, demonstrating that petitioner's counsel and respondent's counsel had not reached a tentative agreement to settle these items until sometime around late July 2009.[13] Moreover, the settlement stipulation attached to respondent's counsel's July 24, 2009, letter was apparently never signed. Instead, the unagreed law practice adjustments were settled by means of a "Stipulation of Agreed Issues" that <u>differed</u> from the "Partial Stipulation of Settled Issues" in that it addressed an additional item, namely, whether the section 6651(a)(1) addition to tax would apply to the unagreed law practice adjustments. The "Stipulation of Agreed Issues" was not signed by petitioner's counsel until September 22, 2009--indicating that the parties did not

---

[13]Petitioner, citing this July 24, 2009, letter, appears to argue that the unagreed law practice adjustments are treated as excluded from the qualified offer so long as they were settled within the 90-day period after the offer was made. This contention is contrary to the regulations, however. <u>See</u> sec. 301.7430-7(c)(3), Proced. & Admin. Regs. (providing that the amount of a qualified offer "must be with respect to all of the adjustments at issue in the * * * court proceeding at the time the offer is made").

**[\*21]** reach a final agreement on the unagreed law practice adjustments until sometime in September 2009. We conclude that the unagreed law practice adjustments had not been settled and therefore remained at issue when petitioner made the qualified offer. Because they were at issue when the qualified offer was made, the unagreed law practice adjustments are treated, pursuant to the regulations, as part of the qualified offer.

Since the unagreed law practice adjustments were included in the qualified offer but settled after it was made and before trial, under the regulations they are treated as part of the "liability pursuant to the judgment". As noted, the liabilities pursuant to the judgment for 2002, 2003, and 2004 all exceed the qualified offer. Consequently, petitioner is not treated as the prevailing party pursuant to section 7430(c)(4)(E).

Whether respondent's position was substantially justified

Applicable law

Because petitioner is not the prevailing party by virtue of section 7430(c)(4)(E), we must decide whether respondent's position was substantially justified. The Commissioner's position is substantially justified if it has a reasonable basis in both law and fact. See Swanson v. Commissioner, 106 T.C. 76, 86 (1996) (citing Pierce v. Underwood, 487 U.S. 552, 565 (1988)). The

**[\*22]** Commissioner's position may be incorrect but substantially justified "if a reasonable person could think it correct".  See <u>Maggie Mgmt. Co. v. Commissioner</u>, 108 T.C. 430, 443 (1997) (quoting <u>Underwood</u>, 487 U.S. at 566 n.2).  This question ultimately turns upon those available facts which form the basis of the Commissioner's position, as well as upon any legal precedents related to the case.  See <u>Maggie Mgmt. Co. v. Commissioner</u>, 108 T.C. at 443.

In deciding whether the Commissioner's position was substantially justified, a significant factor is whether, on or before the date the Commissioner took the position, the taxpayer provided "all relevant information under the taxpayer's control" to the Commissioner.  See <u>Corson v. Commissioner</u>, 123 T.C. at 206-207 (quoting section 301.7430-5(c)(1), Proced. & Admin. Regs.); <u>Trzeciak v. Commissioner</u>, T.C. Memo. 2012-83, 2012 WL 967667, at \*13.  Whenever there is a factual determination, the Commissioner is not obliged to concede the case until the Commissioner receives the necessary documentation to prove the taxpayer's contentions.  See <u>Brice v. Commissioner</u>, T.C. Memo. 1990-355, 60 T.C.M. (CCH) 118, 120 (1990), <u>aff'd without published opinion</u>, 940 F.2d 667 (9th Cir. 1991).  After the Commissioner receives documentation from a taxpayer sufficient to prove his contentions, the Commissioner is entitled to a reasonable

[*23] period to analyze the documentation and make adjustments accordingly. Id.; see also Sokol v. Commissioner, 92 T.C. 760, 765 n.10 (1989).

For purposes of section 7430, the Commissioner's position in a court proceeding generally is the position set forth in the answer. See Maggie Mgmt. Co. v. Commissioner, 108 T.C. at 442. A position that was reasonable when established may become unreasonable in the light of changed circumstances. See RI Unltd., Inc. v. Commissioner, T.C. Memo. 2010-205, 2010 WL 3703835, at *4 (citing section 301.7430-5(c)(2), Proced. & Admin. Regs.). The fact that the Commissioner eventually loses a case does not by itself establish that the position taken is unreasonable, but it is a factor that may be considered. See Maggie Mgmt. Co. v. Commissioner, 108 T.C. at 443.

Section 469 issue in the deficiency case

We start with a brief exploration of the applicable statutory and regulatory provisions defining the circumstances where a taxpayer will be considered to "materially participate" in an activity so as to avoid its designation as a "passive activity", as that discussion will inform the analysis of whether respondent's position was substantially justified.

Section 469(a) disallows the "passive activity loss" of an individual taxpayer. A "passive activity" is, generally speaking, the conduct of any trade or

[*24] business in which the taxpayer does not "materially participate". Sec. 469(c)(1). A "passive activity loss" is the amount by which the aggregate losses from all passive activities for the taxable year exceed the aggregate income from all passive activities for such year. Sec. 469(d)(1).

In general, a taxpayer is treated as materially participating in a trade or business if the taxpayer is involved in the operations of the trade or business on a regular, continuous, and substantial basis. Sec. 469(h)(1). Congress authorized the Secretary to prescribe regulations which specify what constitutes "material participation", see sec. 469(l)(1), and the Secretary promulgated seven regulatory tests in section 1.469-5T(a), Temporary Income Tax Regs., supra. With certain exceptions not pertinent here, an individual is treated as materially participating in an activity if and only if one of the regulatory tests is satisfied. Those tests include whether:

> (1) [t]he individual participates in the activity for more than 500 hours during * * * [the taxable] year;
>
>    *   *   *   *   *   *   *
>
> (7) [b]ased on all of the facts and circumstances * * * , the individual participates in the activity on a regular, continuous, and substantial basis during * * * [the taxable] year.

Sec. 1.469-5T(a)(1), (7), Temporary Income Tax Regs., supra.

**[*25]** Material participation of a taxpayer in an activity is determined separately for each taxable year, see sec. 469(a), and the taxpayer generally has the burden of proving material participation, Rule 142(a); see also Harrison v. Commissioner, T.C. Memo. 1996-509, 1996 WL 659361, at *9.  Generally, any work done by an individual in connection with an activity in which he owns an interest at the time the work is done is treated as "participation" of the individual in the activity.  Sec. 1.469-5(f)(1), Income Tax Regs.  The extent of an individual's participation in an activity may be established by any reasonable means.  Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).

Substantial justification analysis

We held in the deficiency case that petitioner had shown material participation in each year at issue by demonstrating that he participated in the thoroughbred activity for more than 500 hours each year.  We reached that conclusion on the basis of the narrative summary he introduced detailing his estimated hours of participation, and the corroboration of the summary by phone bills, trips to Louisiana that were stipulated, third-party witness testimony, and stipulations covering his extensive interactions with various persons in connection with the activity.

[*26] Respondent's position in the answer and throughout the trial and posttrial briefing was that petitioner had not shown that he materially participated in the thoroughbred activity during any of the years at issue. Petitioner contends that "by May 2009 (and most surely by the end of September 2009)" he had provided respondent with sufficient substantiation regarding his participation in the thoroughbred activity during the years at issue to render respondent's position unreasonable.[14]

---

[14]Petitioner asserts that the Court's determination that he participated in the thoroughbred activity for more than 500 hours during each year at issue also establishes that petitioner satisfied another material participation test in the regulations, namely, that "[b]ased on all of the facts and circumstances", petitioner participated in the thoroughbred activity on a "regular, continuous, and substantial basis" for each year at issue. See sec. 1.469-5T(a)(7), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988). However, the Court made no finding with respect to petitioner's satisfaction of that test. The "regular, continuous, and substantial basis" test of sec. 1.469-5T(a)(7), Temporary Income Tax Regs., supra, requires that management and nonmanagement activities be distinguished. See sec. 1.469-5T(b)(2)(ii), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988). The "more than 500 hours" test of sec. 1.469-5T(a)(1), Temporary Income Tax Regs., supra, does not. Thus, in finding that petitioner satisfied the latter test, we had no occasion to consider the extent to which petitioner had demonstrated participation in nonmanagement activities for each year. We note in this regard that in finding petitioner had satisfied the "more than 500 hours test" for each year, we relied principally on petitioner's phone bills and the Louisiana trips that had been stipulated. We had no occasion to consider whether the evidence of his nonmanagement activities approached the degree of reliability of the phone bills and trips.

Petitioner suggests in his submissions supporting his motion for litigation costs that it is virtually self-evident that he satisfied the "regular, continuous, and

(continued...)

[*27] We disagree that petitioner had provided respondent with sufficient substantiation of his participation by May 2009. The only phone bills demonstrated to have been given to respondent by that time were the five months of petitioner's cell phone bills originally provided during the examination.[15] Respondent's counsel was justified in his unwillingness to concede that petitioner had demonstrated 500 hours of participation in each of the three years at issue at that time.

Approximately five months later, on October 1, 2009, respondent's counsel received from petitioner's counsel (i) an additional 16 months of petitioner's cell

_____

[14](...continued)
substantial basis" test of sec. 1.469-5T(a)(7), Temporary Income Tax Regs., supra, by virtue of satisfying the "more than 500 hours" test of sec. 1.469-5T(a)(1), Temporary Income Tax Regs., supra. We disagree. The extent of petitioner's participation in nonmanagement activities, including the quality of the evidence supporting any claimed nonmanagement activities, was not decided in the deficiency case. Consequently, the deficiency case does not demonstrate whether respondent lacked substantial justification for his position that petitioner had not satisfied the "regular, continuous, and substantial basis" test of sec. 1.469-5T(a)(7), Temporary Income Tax Regs., supra.

[15]At some point after the answer was filed and before September 23, 2009, petitioner had provided respondent with 15 months of bills for petitioner's land line phone at his Minneapolis law office, but the record does not establish that these documents had been provided to respondent by May 2009.

[*28] phone bills spanning 2003 and 2004;[16] (ii) estimates of the time petitioner expended on incoming calls from the breeding facility proprietor and the bloodstock agent in 2002, 2003, and 2004; and (iii) an estimate of petitioner's phone calls in 2002 related to the thoroughbred activity that was based on an extrapolation from the 2003 and 2004 figures. These newly obtained phone bills showed that petitioner's time spent telephoning persons in Louisiana and certain other States concerning the thoroughbred activity was greater than he had previously estimated. As a consequence, petitioner's counsel also provided to respondent's counsel at that time a revised narrative summary reflecting significantly increased estimates of the hours petitioner devoted to the thoroughbred activity in each year.

Respondent's counsel apparently reviewed the newly proffered cell phone bills over the next five weeks, because on November 10, 2009, he stipulated their authenticity. Respondent's counsel also stipulated on that date that petitioner had made trips to Louisiana of approximately three days' duration on five occasions in 2002, three occasions in 2003, and six occasions in 2004. Further stipulations that

---

[16]When added to the 5 months of bills provided during the examination, the phone bills covered 21 of the 24 months in 2003 and 2004. In addition, at some time before October 1, 2009, not disclosed in the record, petitioner's counsel had provided respondent's counsel with 15 months of petitioner's phone bills spanning 2003 and 2004 from his land line phone at his Minneapolis law office.

[*29] respondent entered on that date confirmed the portrait of petitioner that we found in the deficiency case, namely, that of an incessantly phoning micromanager of the thoroughbred activity. Several stipulations respondent's counsel entered established petitioner's habit of weekly, sometimes near daily, phone calls to the proprietors of training or boarding facilities where his horses were kept, to breeders in Louisiana, and to an individual knowledgeable about Louisiana horse breeding activities. The stipulations also established that, in the view of some persons involved in Louisiana horse breeding activities, petitioner exhibited diligence in his efforts that was well above average as compared to a typical Louisiana stallion owner.

In the deficiency case, we relied on these very same phone bills and stipulations--as further corroborated by the testimony of the proprietor of the principal boarding and breeding facility that petitioner used and of an official of the Louisiana thoroughbred breeders association--to conclude that petitioner had demonstrated satisfaction of the "more than 500 hours" test of section 1.469-5T(a)(1), Temporary Income Tax Regs., supra. We concluded that the phone bills and stipulated trips alone established participation of at least 450, 445, and 480

[*30] hours in 2002,[17] 2003, and 2004, respectively, and that other activities that petitioner had demonstrated, such as preparing brochures[18] and handling administrative matters, would easily make up the difference.[19]  The only information respondent's counsel lacked as of November 10, 2009, was the trial testimony of the two aforementioned witnesses who corroborated petitioners' phone habits, the nature of his Louisiana trips, and, thus, the narrative summary. However, respondent's counsel had been provided these witnesses' affidavits and could have interviewed them.

It is true, as respondent maintains, that we discounted some of the phone call time and Louisiana trip time that petitioner claimed in his narrative summary. However, respondent could have done the same and petitioner still would have

---

[17]Although petitioner was unable to obtain any phone bills for 2002, he argued, and we agreed, that it was reasonable to assume that the long-distance phone call volumes in 2003 and 2004 were representative of 2002.

[18]We note in this regard that the promotional materials petitioner prepared and used in the thoroughbred activity had been provided to respondent during the examination.

[19]Petitioner's cell phone bills likewise corroborated his claims regarding his activities during trips to Louisiana.  They demonstrated that he arose early and that he traveled to several locations in the State while he was there.

[*31] succeeded in demonstrating hours expended on the thoroughbred activity exceeding 500 in each year.[20]

Respondent's counsel received the additional phone records and revised narrative summary on October 1, 2009. The cell phone bills were voluminous, and respondent's counsel was entitled to a reasonable period to review and consider the new information. See Sokol v. Commissioner, 92 T.C. at 765 n.10. Our own experience in reviewing petitioner's phone records persuades us that significant time was needed to analyze their contents in order to reach a conclusion that the phone bills substantiated that petitioner had spent the time on phone calls related to the thoroughbred activity that he claimed. We note that while respondent's counsel stipulated the phone bills' authenticity on November 10, 2009, it is our firm conviction that additional time was required to ascertain that the phone bills largely substantiated the hours claimed. We find that 60 days was a reasonable period for this purpose. Given that the phone records were provided to respondent's counsel on October 1, 2009, and the 60 days required to analyze their

---

[20]It is also true, as respondent maintains, that we disregarded an entire category of time that petitioner claimed concerning his activities as a bloodstock agent in Minnesota. As with our discounting of the phone and travel time, however, respondent likewise could have disregarded the bloodstock agent activity and still have reached the conclusion that petitioner had demonstrated satisfaction of the 500-hour requirement in each year.

[*32] significance, we conclude that respondent's position was substantially justified until 60 days after October 1, 2009, or through November 30, 2009. After that time, the phone records--coupled with the stipulation respondent had entered on November 10, 2009, concerning petitioner's habit of making phone calls weekly, and often daily, to the individuals training or boarding his horses, to breeders, and to breeding experts--should have persuaded respondent's counsel that petitioner's phone calls in pursuit of the thoroughbred activity were as extensive as he claimed. Respondent's counsel had also stipulated on November 10, 2009, that petitioner made multiple trips to Louisiana during the years at issue. As noted, we concluded in the deficiency case that the hours petitioner expended on the phone calls and trips alone brought him close to 500 hours in each of the years at issue and, given that petitioner had also spent time on brochure preparation and other administrative tasks during those years, he had demonstrated more than 500 hours of participation in the thoroughbred activity in each year. By November 30, 2009, respondent's counsel had been provided evidence of the foregoing with sufficient time to review it. Consequently, we find that respondent's position that petitioner had not participated in the thoroughbred activity for more than 500 hours for each year at issue was not substantially justified after November 30, 2009.

[*33] In support of a contrary finding, respondent argues that a reasonable person could have thought petitioner's narrative summary unreliable because his estimates of the hours expended on the activity changed significantly through various revisions of the summary. We believe a substantial portion of those changes is attributable to the additional phone bills that petitioner ultimately obtained after several months of effort with the phone companies. Those phone bills showed that petitioner had spent more time pursuing the thoroughbred activity than he had originally estimated. Other revisions were attributable to the organizational improvement brought by petitioner's counsel, as petitioner had prepared the first narrative summary without professional assistance. Respondent also contends that some or many of the calls must have been devoted to something other than the thoroughbred activity. However, this is speculation without any evidentiary support, and it runs counter to the stipulations concerning petitioner's phoning habits. There were third parties who respondent stipulated received extensive phone calls from petitioner in pursuit of the thoroughbred activity, and other third parties whose affidavits to the same effect had been provided to respondent.

Respondent also argues that he was substantially justified in not conceding petitioner's satisfaction of the 500-hours test on the basis of his argument that

**[\*34]** substantial amounts of petitioner's documented hours actually represented petitioner's work as an investor which, pursuant to the regulations, does not count as material participation under certain conditions. See sec. 1.469-5T(f)(2)(ii), Temporary Income Tax Regs., supra. Respondent contends that our having discussed his investor argument in our opinion in the deficiency case indicates that he was substantially justified in maintaining his position on that basis. We disagree. We dismissed respondent's investor argument with a single sentence, pointing out that under the regulations, time spent on investor activities does count where the taxpayer is "directly involved" in the day-to-day management and operations of the activity, as petitioner clearly was. Id. Given the substantial evidence available to respondent that petitioner was "directly involved", respondent's reliance on section 1.469-5T(f)(2)(ii), Temporary Income Tax Regs., supra, was not reasonable and does not render his position substantially justified.

Finally, respondent argues that the deficiency case presented an issue of first impression in that there was no caselaw applying section 469 to the horse breeding industry. This argument lacks merit. There was no substantial unresolved legal issue raised in the deficiency case. Instead, the case involved the application, to a particular industry and set of facts, of the regulatory tests and methods of proof for material participation for section 469 purposes, as set out in

**[*35]** sec. 1.469-5T, Temporary Income Tax Regs., <u>supra</u>. These regulations were promulgated in 1988, <u>see</u> T.D. 8175, 1988-1 C.B. 191, and have been the subject of considerable caselaw, some of which respondent cited in his briefs. There was no issue of first impression in the deficiency case that would provide any grounds for a finding that respondent's position after November 30, 2009, was substantially justified.

We therefore hold that respondent's position was not substantially justified after November 30, 2009. Petitioner is therefore treated as the prevailing party commencing December 1, 2009.

Reasonable litigation costs

Parties' positions

Petitioner is entitled to recover reasonable litigation costs that he incurred starting on December 1, 2009. Petitioner seeks to recover attorney's fees totaling $256,920, based on 642.3 hours[21] of services rendered by his counsel between May 1, 2009, and January 31, 2011, at a rate of $400 per hour. He also seeks to recover out-of-pocket expenses relating to the two trials of $4,062.

---

[21]The hours on the timesheets submitted by petitioner's counsel total 646.3 (excluding the hours for August and September 2009 that petitioner has conceded). We treat petitioner has having conceded the four-hour discrepancy.

[*36] Respondent concedes that petitioner's counsel worked on the deficiency case for 642.3 hours but contends that it was not reasonable for him to expend this much time. Petitioner counters that additional hours were necessary because, on account of petitioner's medical problems, two trials were required and because the work in assembling the narrative summary, and corroborating it, was extensive. Beyond the foregoing, neither party offers any specifics; respondent in particular has not identified any particular hours that he contends were excessive or unnecessary.

Respondent also contends that section 7430(c)(1)(B)(iii) limits the hourly rate for attorney's fees that petitioner may recover to $180 per hour.[22]

Analysis of attorney's fees claimed

Hours

Petitioner provided timesheets showing his counsel's work on the deficiency case between May 1, 2009, and January 31, 2011. Each entry is for a given date and provides a description of the work performed on that date and the hours expended. The entries do not, however, break down the time expended on a

---

[22]Respondent has not contested the $4,062 in out-of-pocket expenses petitioner claimed, covering his counsel's travel-related expenses for the trials in New Orleans and Washington, and his own travel-related expenses for the latter, as well as postage and transcript costs. We therefore consider them conceded. See Cozean v. Commissioner, 109 T.C. 227, 230 n.3 (1997).

**[*37]** given task. Consequently, we are unable to determine the number of hours that petitioner's counsel expended for various tasks. See Huffman v. Commissioner, T.C. Memo. 1994-73, 1994 WL 52368, at *1. This has made the Court's task of determining the reasonableness of the fees difficult in some instances. Since "[t]he fee applicant has the burden of producing satisfactory evidence as to the number of hours reasonably spent on the case", id., any estimates we have made that work to petitioner's detriment are properly attributed to a failure of proof.

Because of our holding that respondent's position was substantially justified through November 30, 2009, petitioner is not entitled to fees for hours that his counsel worked from May 1, 2009, through November 30, 2009. This eliminates 192.8 hours claimed for that period.[23] From December 1, 2009 through January 31, 2011, the timesheets show that petitioner's counsel expended 153.7 hours during the pretrial and trial portions of this proceeding and the remaining 300.1 hours after trial. We will address the pretrial and trial hours separately from the posttrial hours.

---

[23]The timesheets also show 47.7 hours petitioner's counsel expended in August and September 2009 that he agreed not to bill to petitioner. These hours are not included in petitioner's request for an award of litigation costs.

**[\*38]**                 <u>Pretrial and trial hours claimed</u>

We divide our analysis of the pretrial and trial hours into two periods: (1) December 1, 2009, through May 12, 2010 (the day after the May 11, 2010, partial trial); and (2) May 13 through August 20, 2010 (the day after the August 19, 2010, partial trial).

<u>December 1, 2009, through May 12, 2010</u>

Before considering the hours petitioner's counsel expended from December 1, 2009, through May 12, 2010, we first take note of the hours expended during November 2009 in preparation for the trial originally scheduled for November 18, 2009. The trial scheduled for that date was postponed on the day before it was to commence on account of petitioner's illness. In these circumstances, petitioner's counsel would have completed the work necessary to prepare for trial during that period. Since we have concluded that respondent's position was substantially justified during that period, petitioner may not recover these costs. Nonetheless, the hours petitioner's counsel spent on trial preparation during that period are relevant, in that they bear upon the reasonableness of the hours expended in the ensuing months to prepare for the trial rescheduled for May 11, 2010. Petitioner's counsel devoted approximately 50 hours to trial preparation work from November 1, 2009, until the trial was postponed on

[*39] November 17, 2009. Moreover, he had previously devoted approximately 100 hours to petitioner's case from August 1 through October 31, 2009.

The period from December 1, 2009, through May 12, 2010, encompassed the time between the continuance of the originally scheduled November 18, 2009, trial through the first partial[24] trial on May 11, 2010, and the day thereafter.[25] Petitioner's counsel's timesheets record 86.6 hours during this period for which petitioner seeks recovery. As more fully discussed below, we conclude that this amount of attorney time is not reasonable in view of the fact that a significant portion of it appears to be for additional trial preparation for the May 12, 2010, trial setting, even though the case had been prepared for trial in November 2009.

We consider first the hours we find reasonable. The timesheets reflect 16 hours for the roundtrip travel between petitioner's counsel's place of business in Los Angeles and New Orleans, the site of the May 2009 partial trial. We have

---

[24]As noted, a second medical problem, again arising shortly before trial, precluded petitioner from attending the trial scheduled for May 11, 2010, in New Orleans. One week before the trial date, the parties and the Court agreed that the best course of action was to bifurcate the trial, taking the testimony of the witnesses already scheduled for the May 11 trial and taking petitioner's testimony at a future date when his health permitted.

[25]Petitioner's counsel expended 1.1 hour from November 18, 2009 (after the November 18, 2009, trial was postponed), through the end of the month. This time was expended when respondent's position was still substantially justified. Petitioner's counsel recorded no other time on the case until March 1, 2010.

**[*40]** treated attorney time spent traveling as a reasonable litigation cost, <u>see</u>

<u>Lozon v. Commissioner</u>, T.C. Memo. 1997-537, and the Court of Appeals for the

Eighth Circuit, to which an appeal in this case would lie absent a stipulation to the

contrary, <u>see</u> sec. 7482(b)(1)(A), has held that a reasonable attorney's fee covers

reasonable travel time for the purpose of litigation, <u>Craik v. Minn. State Univ. Bd.</u>,

738 F.2d 348, 350 (8th Cir. 1984); <u>see also</u> <u>McDonald v. Armontrout</u>, 860 F.2d

1456, 1462-1463 (8th Cir. 1988); <u>Rose Confections, Inc. v. Ambrosia Chocolate</u>

<u>Co.</u>, 816 F.2d 381, 396 (8th Cir. 1987).[26]  There are also several timesheet entries

concerning preparation of petitioner's pretrial memorandum for the May 2010

partial trial, but it is impossible to determine the precise amount of time devoted to

this task because, as noted, the timesheet entries often list multiple tasks

performed in a single day and a total hours figure without any breakdown of the

time expended on a given task.  Nonetheless we are satisfied that four hours is a

reasonable amount of time for preparation of this pretrial memorandum, given that

a pretrial memorandum had already been prepared for the original November 2009

---

[26]Other Courts of Appeals agree.  <u>See, e.g.</u>, <u>Cent. Pension Fund of the Int'l Union of Operating Eng'rs & Participating Emp'r v. Ray Haluch Gravel Co.</u>, 745 F.3d 1, 7-8 (1st Cir. 2014); <u>Priestley v. Astrue</u>, 651 F.3d 410, 419 (4th Cir. 2011); <u>Cooper v. U.S. RRB</u>, 24 F.3d 1414, 1417 (D.C. Cir. 1994); <u>Crumbaker v. Merit Sys. Prot. Bd.</u>, 781 F.2d 191, 193-194 (Fed. Cir. 1986); <u>Int'l Woodworkers of Am. v. Donovan</u>, 769 F.2d 1388, 1392 (9th Cir. 1985); <u>Henry v. Webermeier</u>, 738 F.2d 188, 194 (7th Cir. 1984).

**[*41]** trial date, and the revisions to it for purposes of the May 2010 partial trial were not substantial. We also find reasonable the eight hours petitioner's counsel expended for trial preparation on the day before the May 2010 partial trial, and the eight hours he expended for the trial itself. Finally, although some of the timesheet entries are vague, it appears that petitioner's counsel devoted 10 to 13 hours in the preparation of a motion (and supplement thereto), with supporting medically related exhibits, in which he requested that the May 2010 trial be bifurcated because of another set of medical problems experienced by petitioner. Having reviewed the motions and the circumstances, we conclude that at most five hours was a reasonable amount of time for this task.

The attorney time in the preceding paragraph that we conclude is reasonable totals 41 hours.

This leaves 45.6 hours of claimed attorney time between December 1, 2009, and the May 2010 partial trial. Insofar as the timesheets disclose, that time was devoted to trial preparation. However, petitioner's counsel had already prepared the case for trial in November. A comparison of the respective pretrial memoranda he filed for the November and May trial settings shows the latter exhibited revisions that were not substantial, including some additional caselaw citations. Petitioner's witnesses were essentially the same; one witness was no

**[*42]** longer listed in the May pretrial memorandum because his testimony had been covered by stipulations--stipulations that had been completed and executed for the November trial. Fifty-four of the fifty-five stipulated exhibits were the subject of stipulations completed for the November trial. While we appreciate that, with the passage of six months, some time was necessary for petitioner's counsel to refresh himself and the witnesses regarding all the matters that had been previously prepared, we are not persuaded that 45.6 hours was reasonable for that purpose. On this record, in view of the fact that petitioner bears the burden of proof to show the amount of reasonable litigation costs, we find that half of the trial preparation hours claimed for the period of December 1, 2009, through May 12, 2010, are reasonable, or 22.8 hours.

The reasonable attorney time for this period therefore totals 63.8 hours.

### May 13 through August 20, 2010

The timesheets from May 13 through August 20, 2010, encompass petitioner's counsel's work from the time immediately after the May 2010 partial trial through the day after the partial (and concluding) trial on August 19, 2010. The hours recorded total 66.8 for this period.

We consider first the hours that are readily determined to constitute reasonable litigation costs. This category would include 16 hours for petitioner's

**[*43]** counsel's roundtrip travel between Los Angeles and the Washington, D.C., location of the August 19, 2010, trial.  See Craik v. Minn. State Univ. Bd., 738 F.2d at 350.  We also conclude that eight hours of trial preparation the day before trial and eight hours for the trial itself is reasonable.

There are additional hours the expenditure of which was caused by the bifurcation of the trial proceedings.  These include 2.4 hours expended between May 13 and 25, 2010, in connection with (1) petitioner's counsel's briefing him regarding the May 2010 partial trial because he was unable to attend and (2) a dispute arising from respondent's position that petitioner should be prohibited from reviewing the transcript of the May 2010 partial trial, which required contacting the Court to resolve.[27]  Also included in this category are three hours expended between July 5 and 12, 2010, wherein petitioner's counsel reviewed petitioner's medical prognosis and conferred with respondent's counsel and the Court concerning when petitioner's testimony could be taken and arranged for accommodations once the August 2010 partial trial was scheduled.  Petitioner's counsel expended additional time reviewing the transcript of the May 2010 partial trial once it was available and conferring with petitioner regarding its contents.

---

[27]Since, as a party, petitioner would have been entitled to hear all testimony at any trial in the deficiency case, the Court rejected respondent's position.

**[*44]** He expended 6.5 hours for this purpose between July 13 and 20, 2010. We conclude that the foregoing was reasonable in view of petitioner's inability to attend the trial.

Petitioner proffered a new exhibit at the August 2010 partial trial, namely, the examining agent's report in connection with an examination of petitioner's 1999 return. The timesheets record one hour expended with respect to the new exhibit on August 3 and 4, 2010. We conclude that this hour represented a reasonable litigation cost.

The foregoing hours total 44.9, leaving 21.9 hours during this period that may be characterized, as best we can ascertain from the sometimes skeletal descriptions in the timesheets, as trial preparation and telephone conferences between petitioner's counsel and petitioner. Given the hours already found reasonable for this period that covered trial preparation and consideration of the May 2010 partial trial transcript, as well as the substantial trial preparation time expended in preparation for the aborted November 2009 trial setting, we conclude that 21.9 additional hours of trial preparation and/or client conferences during this period exceed a reasonable amount. On this record, in view of the fact that petitioner bears the burden of proof to show the amount of reasonable litigation

**[*45]** costs, we find that approximately one-third of this additional claimed trial preparation time, or 7.3 hours, constitutes a reasonable litigation cost.

The reasonable attorney time for this period therefore totals 52.2 hours.

### Posttrial hours claimed

We divide our analysis of the posttrial hours between the periods during which petitioner's opening brief and reply brief were prepared.

### August 21 through December 8, 2010

From August 21 through December 8, 2010, petitioner's counsel recorded 196.3 hours in his timesheets devoted to the deficiency case. As best we can reconstruct from the skeletal timesheet descriptions, the lion's share of this time (176.3 hours) was expended in the preparation of petitioner's posttrial opening brief. The remaining 20 hours were expended--as best we can ascertain from the skeletal timesheet descriptions and the record in the deficiency case--in identifying and correcting an error in one of the trial exhibits.

The trial exhibit in question had summarized petitioner's long-distance phone calls from the phone bills (also in evidence), including their duration, to facilitate the Court's review of the hours petitioner participated in the thoroughbred activity. After trial, however, petitioner's counsel discovered that the call duration times were missing from a significant portion of the phone call

[*46] summary exhibit. He created a revised exhibit and secured respondent's counsel's cooperation, and the parties made a joint motion to reopen the record to admit the revised exhibit (which the Court granted). Given the tedious nature of revising the exhibit, its importance to petitioner's position, and the need to secure respondent's cooperation, we are satisfied that the 20 hours devoted to this project constitute a reasonable litigation cost.

We are not persuaded, however, that the remaining 176.3 hours devoted to preparation of petitioner's opening brief constitute a reasonable litigation cost. Petitioner's opening brief had 36 pages and was devoted to demonstrating that petitioner had satisfied three of the regulatory tests for material participation in section 1.469-5T(a), Temporary Income Tax Regs., supra. Our review of the timesheets persuades us that a key cause of the excessive hours expended on the brief was the extraordinary number of telephone conferences between petitioner's counsel and petitioner during the period petitioner's counsel was writing the opening brief. In several instances there were three such calls in one day; there were also sequences of daily calls that extended several days in a row. As we found in the deficiency case, a hallmark of petitioner's participation in the thoroughbred activity was his incessant telephoning to the persons caring for his horses--to the point of micromanagement--or to persons knowledgeable about the

**[*47]** Louisiana thoroughbred industry practices. We readily draw the inference that petitioner's penchant for incessant telephoning and micromanagement carried over into his participation in the briefing of the deficiency case. To be sure, some amount of client consultation is necessary and appropriate when writing a brief, but here we conclude that the consultation was excessive and caused the preparation time to become unreasonable in relation to the task at hand. As a consequence, we will treat one-half of the 176.3 hours expended, or 88.2 hours, as constituting reasonable litigation costs.

Consequently, 108.2 hours from this period give rise to reasonable litigation costs.

### December 9, 2010, through January 31, 2011

The timesheets record that petitioner's counsel expended 103.8 hours working on the reply brief from December 9, 2010, through January 31, 2011. These timesheets also reflect excessive telephoning with petitioner. There are multiple instances of three telephone conferences in a single day and one instance where there were five. For the same reasons as with the opening brief, we conclude that one-half of the time devoted to preparation of the reply brief was not a reasonable litigation cost. Thus, reasonable litigation costs include 51.9 hours of petitioner's counsel's time during this period.

**[*48]**        Conclusion

The hours from petitioner's counsel's timesheets that we conclude

constitute reasonable litigation costs are summarized in the table below.

| Period | Claimed hours | Reasonable hours |
|---|---|---|
| 12/1/2009-5/12/2010 | 86.6 | 63.8 |
| 5/13-8/20/2010 | 66.8 | 52.2 |
| 8/21-12/8/2010 | 196.3 | 108.2 |
| 12/9/2010-1/31/2011 | 103.8 | 51.9 |
| Total | 453.5 | 276.1 |

        Hourly Rate

Petitioner has claimed the cost of attorney's fees at a rate of $400 per hour.

As noted, the inflation-adjusted statutory limit on the recoverable hourly rate for

the years these hours were expended was $180 unless a "special factor" is shown.

Sec. 7430(c)(1)(B)(iii).

Petitioner asserts that he is entitled to a higher rate because of his counsel's

long experience with representing clients in horse-related matters, including

matters with tax issues.  In a supporting declaration, petitioner's counsel asserts

that he had knowledge of the horse industry (including breeding, training, and

marketing) that "obviously saved time in this case" and would have required

numerous hours of study for another attorney to learn.  Petitioner also asserts that

**[*49]** the $400 per hour is "a prevailing community rate for attorneys in the Los Angeles area with * * * [petitioner's counsel's] experience".

A taxpayer may be entitled to an enhanced rate of recovery for fees paid to an attorney who possessed distinctive knowledge or a specialized skill that was needful for the litigation in question. See Cozean v. Commissioner, 109 T.C. at 232 (citing Underwood, 487 U.S. at 572); Pietro v. Commissioner, T.C. Memo. 1999-383, 1999 WL 1063541, at *2 (enhanced fee award based in part on a stipulation that "few other attorneys in * * * [the region] had the expertise to deal with the issues raised in the notice of deficiency"). Petitioner appears to assert that the issues in this case required hiring someone with his counsel's asserted horse industry expertise,[28] which petitioner presumably contends constitutes distinctive knowledge or a specialized skill. Assuming that petitioner's counsel had such expertise, and that it could qualify as a distinctive knowledge or a

---

[28]To the extent petitioner may be arguing that his counsel's tax expertise warranted a higher rate, that argument has been rejected. See, e.g., Huffman v. Commissioner, 978 F.2d 1139, 1149-1150 (9th Cir. 1992), aff'g in part and rev'g in part T.C. Memo. 1991-144; Cassuto v. Commissioner, 936 F.2d 736, 743 (2d Cir. 1991) (stating that treating tax expertise as a special factor "would allow this 'special factor' exception to swallow the * * * rule"), aff'g in part, rev'g in part 93 T.C. 256 (1989); Bode v. United States, 919 F.2d 1044, 1050 (5th Cir. 1990) ("[E]xpertise in tax law, in and of itself, is not a special factor * * * under section 7430."). Petitioner has not suggested or shown that there was no "local availability of tax expertise", as provided in sec. 7430(c)(1)(B)(iii), in Minneapolis, where he resided.

[*50] specialized skill,[29] we disagree that it was needful to this litigation. To prevail on the passive activity loss issue, the principal issue in the deficiency case, petitioner had to prove the extent of his participation in the thoroughbred activity. This required his counsel to gather and present evidence of the nature and extent of petitioner's participation in the activity, including his participation in management and that of others. See sec. 1.469-5T, Temporary Income Tax Regs., supra. This required generalized tax and litigation expertise. However, as for horse industry expertise, we agree with respondent that this case did not require the Court to make any determinations regarding breeding rights, stud or sale contracts, distribution of race winnings, or any other equine-related issues under Minnesota or Louisiana law.[30] Thus, any equine industry expertise of petitioner's counsel did not play a significant role in this case. It therefore is not a special factor warranting a departure from the statutory rate. As for petitioner's argument that his counsel's equine expertise saved time, that contention has been rejected as

---

[29]We note that the Court of Appeals for the Fifth Circuit has stated that "[s]pecial legal expertise about the quarterhorse industry may well * * * qualif[y] as a special factor". Bode v. United States, 919 F.2d at 1051.

[30]Although the Court's opinion in the deficiency case cited various Louisiana statutes that incentivized in-State ownership, breeding, and racing of thoroughbred horses--because they rendered petitioner's siting of his activity there more plausible--we did so without assistance from petitioner's counsel's briefing.

[*51] giving rise to a special factor.  See Ragan v. Commissioner, 210 F.3d 514, 521 (5th Cir. 2000), rev'g on other issues T.C. Memo. 1995-184.  Finally, with respect to petitioner's contention that his claimed $400 per hour rate is the applicable "prevailing community rate", it is well settled that the prevailing community rate is not a special factor justifying a higher rate.  See Huffman v. Commissioner, 978 F.2d 1139, 1149-1150 (9th Cir. 1992) (citing Underwood, 487 U.S. at 572), aff'g in part, rev'g in part T.C. Memo. 1991-144.

For the foregoing reasons, we hold that petitioner has not shown entitlement to recover attorney's fees at a rate above the $180 per hour statutory rate.

We have considered all the remaining arguments for results contrary to those reached herein.  To the extent not discussed, we conclude those arguments are moot, without merit, or unnecessary to reach.

To reflect the foregoing,

An appropriate order and decision will be entered.